UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SUSAN H. McCALLION, Plaintiff, v. MAMARONECK UNION FREE SCHOOL DISTRICT, Defendant. | : | **MEMORANDUM DECISION** 10 CV 6207 (VB) |

Briccetti, J.:

Pro se plaintiff Susan H. McCallion ("Parent"), on behalf of her son, G.K.I.H. ("I.H."), brings this action against defendant Mamaroneck Union Free School District (the "District") pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400, et seq. Parent seeks judicial review of a decision by a State Review Officer ("SRO") at the New York State Education Department, which found the District's proposed Individualized Education Program ("IEP") for the 2008-09 academic year offered I.H. a free appropriate public education ("FAPE").

The District has moved for summary judgment (Doc. #19), and Parent has cross-moved for summary judgment (Doc. #22). For the reasons set forth below, the District's motion is GRANTED, and Parent's motion is DENIED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## BACKGROUND

I. Statutory Framework

The IDEA was enacted to promote the education of disabled children. See Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 179 (1982). States receiving public funds are required to provide a FAPE to children with disabilities. 20 U.S.C. § 1412(a)(1)(A). Public school districts must provide "special education and related services tailored to meet the unique needs of a particular child, [which are] 'reasonably calculated to enable the child to receive educational benefits.'" Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (quoting Rowley, 458 U.S. at 207). These services are determined by the student's IEP, which school districts must develop periodically in collaboration with the child's parents. See 20 U.S.C. § 1414(d)(2)(A).

In New York, if the parents disagree with any part of the IEP process they may request an impartial due process hearing, which is administered by an impartial hearing officer ("IHO") appointed by the local board of education. See 20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1)(a). The IHO's decision may be appealed to an SRO. See N.Y. Educ. Law § 4404(2); see also 20 U.S.C. § 1415(g). The SRO's decision may be challenged in state or federal court. See 20 U.S.C. § 1415(i)(2)(A).

A board of education may be required to reimburse parents for private educational services if: (1) the services offered by the board of education were inadequate or inappropriate; (2) the services selected by the parents were appropriate; and (3) equitable considerations favor the parents' claim. See Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70, 374 (1985); Florence Cnty. Sch. Dist. Four v. Carter, 510 U.S. 7 (1993).

## II. Factual Background

I.H. was born April 30, 1994. He attended kindergarten and first grade in the District. (Tr. at 1700-01.)[1] I.H. attended second grade at a public school outside the District. During that year, Parent was first told that I.H. had "a serious learning disability." (Id. at 1701.) I.H. then attended a private special education school for third, fourth, and part of fifth grade. (Id. at 1701-02.) In January 2005 – mid-way through I.H.'s fifth grade year – Parent placed I.H. in an "intensive" program at the Lindamood-Bell learning center. (Id. at 1704). Upon completion of that program, I.H. finished fifth grade by receiving tutoring from the private special education school. (Tr. at 1705.)

Parent enrolled I.H. in a District middle school for sixth grade (the 2005-06 school year) and referred him to the District's Committee on Special Education ("CSE"). (Id. at 1705-06; Dist. Ex. 42.) The CSE met on October 11, 2005, and determined I.H. had a learning disability and thus was eligible for special education programs. (Dist. Ex. 3 at 1.) The CSE then created an IEP for I.H. (the "October 2005 IEP"), which recommended I.H. participate in "integrated" science and social studies classes (i.e., classes comprised of both disabled and non-disabled students), a "nonintegrated" reading skills class (i.e., a class comprised of only disabled students), nonintegrated special classes for English and math, and a special "skills" class. (Id.) The IEP further recommended I.H. receive several "program modifications," including the provision of class notes, modified assignments, and extra time to complete tests. (Id. at 1-2.) The October 2005 IEP indicates that Parent agreed with the CSE's recommendations. (Id. at 4.)

I.H. earned passing grades during the 2005-06 school year and made progress in some

[1] "Tr." refers to the transcript of the IHO hearing. "Dist. Ex." refers to the exhibits submitted by the District at that hearing, and "Parent Ex." refers to Parent's exhibits.

classes (particularly social studies), but continued to have problems in his other classes (especially reading and math). Additionally, I.H. sometimes fell asleep during class or otherwise failed to stay on task. (Dist. Exs. 24-29.)

On June 2, 2006, the CSE met to develop an IEP for I.H.'s seventh grade year (the "June 2006 IEP"). (Dist. Ex. 4.) The June 2006 IEP recommended I.H. continue attending the special education programs described in the October 2005 IEP, as well as attend biweekly group counseling sessions. (Id.) The June 2006 IEP also set forth several goals for I.H. in areas such as study skills, reading, and math. (Id. at 5). Parent agreed with the recommendations contained in the June 2006 IEP. (Id. at 4.)

Parent testified that seventh grade was "the best year [I.H.] had," and he "made some improvements" over the course of the year. (Tr. at 1707.) Parent further noted, however, that by the end of the school year, I.H. "was starting to fail again." (Id.)

The CSE met again on June 7, 2007, to develop an IEP for I.H.'s eighth grade year (the "June 2007 IEP"). (Dist. Ex. 5.) In addition to continuing the special education programs recommended in the previous two IEPs, the June 2007 IEP recommended I.H. participate in individual counseling sessions rather than group sessions. (Id. at 1). As with the previous IEPs, the June 2007 IEP indicated that Parent agreed with the CSE's recommendations. (Id. at 5.)

Also in June 2007, I.H. began seeing a private clinical social worker referred to Parent by I.H.'s school psychiatrist. (Tr. at 220-21.) In September 2007, after meeting with I.H. several times and reviewing the results of various psychological tests previously administered by the District, the social worker diagnosed I.H. with "ADHD, hyperactiv[ity], . . . generalized anxiety, [and] adjustment disorder with some anxiety." (Id. at 223-24.) Over the course of his meetings

with I.H., the social worker observed that I.H. had trouble reading and writing, was highly disorganized, and was reluctant to go to school because he felt inadequate. (Id. at 227-32.) The social worker subsequently referred Parent and I.H. to the New York University Child Study Center ("NYU") for further testing. (Id. at 233.)

In late January and early February 2008, I.H. underwent a "neuropsychological and educational evaluation" at NYU. (Parent Ex. B at 1.) The test results and accompanying report showed that I.H. performed anywhere from the "impaired" range to the "above average" range on various tasks. (Id. at 3-11.) I.H. generally performed poorly on tasks involving reading, spelling, and writing. (Id. at 8-9.) The report concluded:

> the nature of academic, neuropsychological and social-emotional difficulties described above in combination with [I.H.]'s overall strengths in intellectual functioning are consistent with patterns observed in children who have significant difficulty learning in traditional academic settings. Indeed, these weaknesses require intensive intervention to help [I.H.] to learn and to perform to the best of his abilities. The patterns of difficulties are consistent with several DSM-IV diagnoses: Reading Disorder (315.00)[,] Attention Deficit Hyperactivity Disorder – combined type (314.01), Developmental Coordination Disorder (315.4), Disorder of Written Expression (315.2) and a Learning Disorder – Not otherwise Specified (315.9, characterized by slow processing speed, poor word retrieval, and weaknesses in verbal and nonverbal learning).

(Id. at 13.)[2]

The report made several recommendations with respect to I.H.'s continued schooling, including placement in special education classes in a special education school, numerous accommodations, daily individual work with a remediation specialist, and medication. (Id. at 13-15.)

In February or March 2008, during the spring semester of I.H.'s eighth grade year, Parent

[2] "DSM-IV diagnoses" refers to diagnoses contained in the fourth edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders.

began looking into non-District schools for I.H. to attend for ninth grade. (Id. at 1831.) Among other schools, Parent applied to enroll I.H. at the Gow School ("Gow") – an all-boys, private boarding school with a curriculum that emphasizes "the remediation of dyslexia through Reconstructive Language." (Parent Ex. C-2 at 1.)[3] I.H. visited Gow in April 2008 and underwent an "admissions assessment." (Tr. at 1862-63; Dist. Ex. 54 at 33A-B.) By letter dated April 28, 2008, Gow notified Parent that I.H. was invited to join Gow's ninth grade class for the 2008-09 school year, and Parent signed an "enrollment reservation contract" on May 13, 2008. (District Ex. 54 at 25A; Parent Ex. I at 2A.) Parent did not yet inform the District she planned to enroll I.H. in a non-District school for the 2008-09 school year.

On May 20, 2008, the CSE convened to produce an IEP for I.H.'s ninth grade year (his first year of high school) (the "May 2008 IEP"). (Dist. Ex. 6 at 1.) Parent, who attended the meeting, provided the CSE with the results of the NYU testing. The May 2008 IEP reflected I.H.'s continued academic and attention deficits, although it noted I.H. had demonstrated improvement in some classes, as well as in his social skills. (Id. at 3-5.) The May 2008 IEP recommended I.H. attend nonintegrated classes four days per week, as well as biweekly counseling sessions. (Id. at 1.) The May 2008 IEP also included goals and recommended accommodations, and further recommended an "Assisted Technology assessment" be conducted in the fall of 2008, which would be "specific to the high school setting." (Id. at 5.) The May 2008 IEP indicated that Parent would visit Mamaroneck High School to determine whether, in her view, the recommended programs would meet I.H.'s needs. (Id.)

---

[3] Parent's Exhibit C consists of a fourteen-page document providing an overview of the Gow School's curriculum, followed by an individually-paginated, 134-page document containing detailed course descriptions and the like. "Parent Ex. C-2" refers to the second of these documents.

In June 2008 – before the completion of the 2007-08 school year – Parent visited the high school and observed the special education classes the May 2008 IEP recommended I.H. attend. (Tr. at 1791.) Parent also met with the chairperson of the school's special education department. (Id. at 1761-62.)

In July 2008, in response to Parent's ongoing concerns regarding the District's ability to meet I.H.'s education needs at the high school level, the District emailed Parent with several recommended amendments to the May 2008 IEP based on the NYU test results. (District Ex. 45.) Specifically, the District recommended that: (1) I.H. utilize certain assistive technology programs; (2) the high school psychologist consult with I.H.'s private social worker and a doctor from NYU; (3) I.H. attend integrated English and Social Studies classes with special education support; (4) I.H. have access to a "Learning Skills Resource Room"; and (5) the District provide I.H. with "more frequent counseling support." (Id.)

Parent responded: "[t]here are still several problem areas – specifically science, math and most importantly reading which we need to discuss further." (Id.)

On August 20, 2008, Parent met with several District personnel, including the director for secondary special education and the chairperson of the special education department at Mamaroneck High School. (Dist. Ex. 47). In an email sent to Parent the next day discussing the meeting, the District acknowledged Parent was "considering an out of [D]istrict placement" for I.H. to better address his reading needs. (Id.) In response to Parent's concerns, the District recommended further amending the May 2008 IEP, including scheduling an additional "Skills" class and a reading class utilizing a methodology other than the "Wilson program," which, up to that point, had not sufficiently improved I.H.'s reading skills. (Id.) The District indicated these

recommendations would be implemented as soon as Parent approved them, and a subsequent CSE meeting would be held during the second week of school. (Id.)

Parent responded on August 28, 2008. She explained she did not believe the District could provide I.H. with an "adequate education program" because Mamaroneck High School was "just developing its customized programs for [learning disabled] students and does not have a completely integrated and structure[d] reading program other than Wilson." (Dist. Ex. 49.) Parent believed I.H. needed "at least one year of a more structured and specialized program in order to learn and thrive," so she had decided to enroll I.H. at Gow. (Id.)

The District responded by thanking Parent and indicating that Parent could contact the District at any time if she wished to re-enroll I.H. at a District school. The District also reiterated its offer to "customize a research-based balanced literacy program for [I.H.] with speech and assistive technology support." (Dist. Ex. 50.) The District further noted that Mamaroneck High School had worked with learning disabled students with needs similar to I.H.'s for several years, and those students attended competitive colleges and became successful adults. (Id.)

Although Parent had informed the District that she enrolled I.H. at Gow for the 2008-09 school year, the CSE still met in October 2008 to formalize a new IEP for I.H. (the "October 2008 IEP"), which incorporated the amended recommendations previously discussed with Parent. Parent attended the October 2008 CSE meeting. The October 2008 IEP provided for a combination of integrated and non-integrated classes, including special skills classes, along with numerous program modifications and accommodations. (Dist. Ex. 7 at 1-2.) The October 2008 IEP indicated that, although Parent decided to enroll I.H. at Gow (which is not on the "N.Y. State approved list"), the District continues to recommend an in-District education program for I.H.

(Id. at 5.)

On May 20, 2009, near the end of I.H.'s ninth grade year at Gow, Parent initiated a due process proceeding, seeking reimbursement for I.H.'s Gow tuition because the District could not provide I.H. with a FAPE. (Dist. Ex. 1.)

A. The IHO Decision

The impartial hearing consisted of eight days of testimony occurring between July 30 and November 19, 2009. (Am. Compl. Ex. A ("IHO Decision") at 3-4.) The IHO issued his decision on January 20, 2010. As a threshold matter, the IHO determined that the May 2008 IEP – not the October 2008 IEP – was the operative legal document in determining whether the District had provided I.H. with a FAPE for the 2008-09 school year. (Id. at 14.) The IHO then found that the May 2008 IEP had failed to provide I.H. with a FAPE. (Id. at 16.) Although the IHO acknowledged the May 2008 IEP "[o]n its face . . . offers a prima facie [appropriate] educational program," he found it had failed to provide for the small classes and specially trained faculty needed to educate "severely dyslexic students" like I.H. (Id.)

The IHO also found the District had failed to weigh properly I.H.'s academic and emotional problems. Specifically, despite the NYU neuropsychologist's conclusion that I.H.'s "'emotional experiences' were 'secondary to his academic difficulties,'" the May 2008 IEP contained a large number of "Social/Behavioral goals" and a "relative paucity of reading goals." (Id. at 17) (quoting Tr. at 1004.) As a result, although each IEP created goals to address "reading" generally, I.H.'s test results showed "virtually no meaningful progress" over time. (Id.) In concluding the May 2008 IEP was unlikely to spark improvement in I.H.'s reading skills as he entered high school, the IHO credited the testimony of an NYU professor of psychiatry,

who stated: "to be in a high school of a thousand children is unacceptable for a kid with [I.H.]'s disability. It's too big, it's unmanageable, it's – I don't know how he would do this on a daily basis." (Id.) (quoting Tr. at 915-16.)

Having found the District failed to provide I.H. with a FAPE, the IHO further found that Gow was an "appropriate placement" for I.H., thus entitling Parent to tuition reimbursement for the 2008-09 school year. (Id. at 18.) However, the IHO reduced Parent's reimbursement by eighty percent because Parent had failed to provide "notice to the District that [she] would be seeking tuition reimbursement prior to" unilaterally enrolling I.H. at Gow. (Id. at 20.)

B. The SRO Decision

The District appealed the IHO's finding that the District failed to provide I.H. a FAPE for the 2008-09 school year, and Parent cross-appealed the IHO's determination that her tuition reimbursement should be reduced by eighty percent. (Am. Compl. Ex. B ("SRO Decision") at 1.) In a twenty-page decision dated April 22, 2010, the SRO reversed the IHO, finding the District had provided I.H. with a FAPE.

First, the SRO disagreed with the IHO's determination that the May 2008 IEP was the operative IEP with respect to the 2008-09 school year. Instead, the SRO found the operative document was the October 2008 IEP, because it incorporated substantial modifications to the May 2008 IEP that were proposed to Parent before the start of the 2008-09 school year. (Id. at 14.) According to the SRO, the mere fact the October 2008 IEP was not formally adopted until after Parent enrolled I.H. at Gow was irrelevant. (Id.)

Next, the SRO found the IHO erred by making findings concerning the goals set forth in the May 2008 IEP and the "absence of a class profile for the [D]istrict's recommended class"

because those issues were not raised in Parent's due process complaint. (Id.)

The SRO further found "the October 2008 IEP was appropriate and was reasonably calculated to provide educational benefits to" I.H., noting that the members of the CSE who developed the proposed alterations to the May 2008 IEP had a detailed understanding of I.H.'s needs, and proposed services and accommodations reasonably calculated to address those needs. (Id. at 15-17.) In particular, the October 2008 IEP incorporated nine of the ten accommodations recommended by the NYU report. (Id. at 17.)

The SRO also found – contrary to Parent's contentions and the IHO's conclusions – I.H. had made meaningful academic progress in the years prior to 2008-09, including in reading. In support of this finding, the SRO cited I.H.'s passing grades, the testimony of his teachers, and the results of reading tests which indicated he had maintained the same overall achievement level from seventh to eighth grade when compared to same-aged peers. (Id.)

Finally, the SRO disagreed with the IHO's finding that the CSE improperly failed to consider whether I.H. should have been placed in a specialized school, as the NYU report recommended. (Id. at 18.) As the SRO explained, the NYU evaluators did not have access to I.H.'s IEPs, nor did they speak with the District personnel who had worked with I.H. Consequently, the evaluators' understanding of I.H.'s existing educational program was based solely on representations made by Parent, and several of Parent's representations were inaccurate. (Id.) For example, the NYU evaluators incorrectly believed I.H. "had been in a mainstream placement and was receiving resource room services and testing accommodations, including a reader and a scribe." (Id.) The clinical director at NYU testified that, "had she known this was not an accurate understanding of the supports" I.H. was provided by the District,

"she would have reflected something different in her report." (Id.) (internal quotations omitted).

The SRO concluded the record demonstrated I.H. did not require placement in a specialized boarding school to receive education benefits, and his needs would be appropriately addressed in the least restrictive environment by the programs recommended in the October 2008 IEP. (Id. at 19.) Consequently, the SRO reversed the IHO and found the District had offered I.H. a FAPE for the 2008-09 school year. (Id.)

Parent thereafter filed this action appealing the SRO's decision, following which the parties cross-moved for summary judgment.

## DISCUSSION

### I. Applicable Legal Standards

Motions for summary judgment usually resolve IDEA cases in federal court. See Viola v. Arlington Cent. Sch. Dist., 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006). Unlike in an ordinary summary judgment motion, the existence of a disputed issue of material fact will not necessarily defeat the motion. Id. Rather, summary judgment in the IDEA context functions as an appeal from an administrative decision. T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir. 2009).

In a review action pursuant to the IDEA, the Court (1) reviews the records of the administrative proceedings; (2) hears additional evidence at the request of a party; and (3) grants such relief as it deems appropriate based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(c); see Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 380 (2d Cir. 2003).

The standard of review for IDEA cases has been characterized as "modified de novo." M.R. v. South Orangetown Cent. Sch. Dist., 2011 WL 6307563, at *6 (S.D.N.Y. Dec. 16, 2011).

Although the court must engage in an independent review of the record and make a determination based on a preponderance of the evidence, its review of state administrative decisions is limited. See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 205-06; Walczak v. Fla. Union Free Sch. Dist., 142 F.3d at 129. The Supreme Court and the Second Circuit have cautioned that the IDEA requires "substantial deference to state administrative bodies on matters of educational policy." Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 191 (2d Cir. 2005). Thus, the court must be mindful "that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy," Walczak v. Fla. Union Free Sch. Dist., 142 F.3d at 129, and should not "substitute [its] own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206. Deference is particularly appropriate when the SRO's review has been "thorough and careful." Walczak v. Fla. Union Free Sch. Dist., 142 F.3d at 129).

In short, the Court should not disturb an SRO decision that "is reasoned and supported by the record." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 114 (2d Cir. 2007). This is true even when the SRO disagrees with the IHO's determination. See M.H. v. N.Y.C Dep't of Educ., 685 F.3d 217, 241 (2d Cir. 2012) (citing A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist., 553 F.3d 165, 171 (2d Cir.2009)).

As the Second Circuit clarified in M.H. v. New York City Department of Education, "the district court's determination of the persuasiveness of an administrative finding must also be colored by an acute awareness of institutional competence and role." 685 F.3d at 244. Courts should afford more weight to SRO determinations when they involve the substantive adequacy

of an IEP. Id. (citing Cerra v. Pawling Cent. Sch. Dist., 427 F.3d at 195). Furthermore, the Court should afford more deference to the SRO when the decision is "grounded in thorough and logical reasoning" and when the Court's "review is based entirely on the same evidence as that before the SRO." Id.

## II. Operative IEP

As a threshold matter, the Court agrees with the SRO that the October 2008 IEP is the operative IEP for purposes of this appeal. Although the October 2008 IEP was not finalized until after I.H. began attending Gow, it incorporates recommended classes, accommodations, and goals that were presented to Parent prior to her unilateral decision to enroll I.H. at Gow. While it may have been desirable for the October 2008 IEP to have been completed earlier, any delay in finalizing the IEP did not prejudice I.H.'s education, particularly considering Parent had indicated to the District prior to the start of the school year that she believed the education program subsequently memorialized in the October 2008 IEP was insufficient to meet I.H.'s educational needs. See E.H. v. Bd. of Educ. of Shenendehowa Cent. Sch. Dist., 2008 WL 3930028, *9-10 (N.D.N.Y. Aug. 21, 2008) aff'd, 361 F. App'x 156 (2d Cir. 2009) (citing Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d at 382). Therefore, the October 2008 IEP is the operative IEP with respect to I.H.'s 2008-09 school year.

## III. Appropriateness of the October 2008 IEP

Parent argues the October 2008 IEP denied I.H. a FAPE. She seeks reversal of the SRO Decision and reinstatement of the IHO Decision to the extent it found the District failed to provide I.H. a FAPE for the 2008-09 school year. Parent also seeks reversal of the IHO decision insofar as it reduced Parent's reimbursement by eighty percent.

The IDEA does not require an ideal placement for a student, but rather one that is "likely to produce progress, not regression" and that provides the student with the opportunity for more than "trivial advancement." Walczak v. Fla. Union Free Sch. Dist., 142 F.3d at 130. Thus, the IEP at issue must be "reasonably calculated to enable the child to receive educational benefits." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 206-07.

"In applying this reasonably calculated standard, such objective factors as the grading and advancement system are important measures of acceptable progress[, a]nd when the [learning disabled] child is being educated in the regular classrooms of a public school system, the achievement of passing marks and advancement from grade to grade will be one important factor in determining educational benefit." Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist., 281 F. Supp. 2d 710, 716 (S.D.N.Y. 2003) (internal quotation marks, citations, and alterations omitted).

As noted above, "[b]ecause administrative agencies have special expertise in making judgments concerning student progress, deference [to the SRO] is particularly important when assessing an IEP's substantive adequacy." Cerra v. Pawling Cent. Sch. Dist., 427 F.3d at 195. Such difference is appropriate when, as in I.H.'s case, the Court's "review is limited to the administrative record on which the SRO based his decision." P.K. ex rel. P.K. v. Bedford Cent. Sch. Dist., 569 F. Supp. 2d 371, 384 (S.D.N.Y. 2008). Furthermore, the Court should not choose between the competing views of experts on matters of educational policy or substitute its own judgment for that of the hearing officers that it reviews. Id. (citing Briggs v. Bd. of Educ. of Conn., 882 F.2d 688, 693 (2d Cir. 1989); A.E. v. Westport Bd. of Educ., 463 F. Supp. 2d 208, 220 (D. Conn. 2006)).

Finally, this Court's "review is 'necessarily prospective in nature;' therefore, we must not engage in 'Monday-morning quarterbacking' influenced by our knowledge of [I.H.]'s subsequent progress" at Gow. Viola v. Arlington Cent. Sch. Dist., 414 F. Supp. 2d 366, 382 (S.D.N.Y. 2006).

Here, as the SRO noted, the record shows that I.H. received passing marks and successfully progressed from grade to grade. (SRO Decision at 17.) The SRO also accurately noted that some of I.H.'s test results indicate he maintained the same overall achievement levels from grade to grade when compared to same-aged peers. (Id.) Additionally, the SRO properly credited the testimony of District educators and specialists who indicated I.H. had made meaningful academic progress pursuant to past IEPs. (See, e.g., Tr. at 351-69.) Because the SRO's conclusions are supported by evidence in the record, the Court defers to the SRO with respect to these findings. See P.K. ex rel. P.K. v. Bedford Cent. Sch. Dist., 569 F. Supp. 2d at 384.

Even if I.H. had failed to make meaningful academic progress prior to the 2008-09 school year, the October 2008 IEP contains several recommendations and accommodations not contained in I.H.'s previous IEPs. These additions were aimed at further improving I.H.'s performance, particularly with respect to reading. For example, the October 2008 IEP provided for (1) the use of the "Kurzweil" and "Dragon" assistive technology programs, and (2) additional accommodations for I.H., including the provision of notes prior to lectures and access to a word processor. Furthermore, the District informed Parent prior to the start of the 2008-09 school year that I.H.'s reading class would utilize a methodology other than the "Wilson program" in response to Parent's concern that the Wilson program was ineffective. Therefore, the Court finds

Parent has failed to demonstrate that the educational program proposed by the District would not provide I.H. with a FAPE.

To the extent Parent argues that the District failed to offer I.H. a FAPE for the 2008-09 school year because I.H.'s academic performance drastically improved during his year at Gow, it is improper for the Court to consider I.H.'s subsequent academic performance for purposes of this appeal. See Viola v. Arlington Cent. Sch. Dist., 414 F. Supp. 2d at 382.

Parent further argues that the SRO erred by relying too heavily on the evaluations and opinions of the District's witnesses while giving little or no weight to the conclusions of Parent's experts from NYU. This argument is unavailing. First, as the SRO explained in his decision, the NYU evaluated the appropriateness of I.H.'s current educational program based entirely on Parent's representations concerning the details of that program, and some of those representations were inaccurate. Consequently, the SRO appropriately discredited certain recommendations contained in the NYU report. In any event, the fact "[t]hat privately hired experts recommended different teaching methodologies for [I.H.] does not undermine the deference the Court must pay to the District. . . . [I]t is inappropriate to choose between views of 'conflicting experts on a controversial issue of educational policy . . . in direct contradiction of the opinions of state administrative officers who had heard the same evidence.'" Watson v. Kingston City Sch. Dist., 142 F. App'x 9, 10 (2d Cir. 2005) (quoting Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d at 382).

The SRO also did not err in determining the members of the CSE that developed the October 2008 IEP had sufficient knowledge of I.H.'s disabilities and needs. Contrary to Parent's contentions, the numerous, detailed recommendations contained in the October 2008 IEP

indicate it was developed with I.H.'s specific needs in mind. Notably, Parent actively participated in the development of the October 2008 IEP, both by attending the CSE meeting and by exchanging several follow-up emails with District personnel. Therefore, any procedural defect with respect to the composition of the CSE "was not alone sufficient to result in the loss of educational opportunity." Evans v. Bd. of Educ. of Rhinebeck Cent. Sch. Dist., 930 F. Supp. 83, 98 (S.D.N.Y. 1996).

In sum, the October 2008 IEP was reasonably calculated "to produce progress, not regression," Walczak v. Fla. Union Free Sch. Dist., 142 F.3d at 130, and thus was "reasonably calculated to enable [I.H.] to receive educational benefits." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 206-07. Therefore, the October 2008 IEP provided I.H. with a FAPE for the 2008-09 school year. Having found the District provided I.H. with a FAPE, the Court need not consider whether Gow was an appropriate alternative placement.

## IV. Parent's Additional Claims

Parent further contends the District failed to produce "key test results and copies of tests referred to in the due process hearing by [the] District's own witnesses." (Am. Compl. ¶57.) However, because Parent failed to raise this issue before the IHO or SRO, the Court lacks subject matter jurisdiction to consider that claim. 20 U.S.C. §1415(l); see Polera v. Bd. of Educ., 288 F.3d 478, 481 (2d Cir. 2002) ("[P]otential plaintiffs with grievances related to the education of disabled children generally must exhaust their administrative remedies before filing suit in federal court.").

Parent also brings claims relating to school years other than 2008-09 and a claim against the District for what amounts to education malpractice. These claims also were not raised before to IHO or SRO, and the Court therefore lacks subject matter jurisdiction to consider them. Id.

**CONCLUSION**

Defendant's motion for summary judgment (Doc. #19) is GRANTED, and plaintiff's motion for summary judgment (Doc. #22) is DENIED. The Court therefore affirms the decision of the SRO and dismisses the complaint.

The Clerk is instructed to terminate these motions and close the case.

Dated: January 22, 2013
White Plains, NY

SO ORDERED:

Vincent L. Briccetti
United States District Judge